**OF THE**
**STATE OF DELAWARE**

BONNIE W. DAVID
VICE CHANCELLOR

COURT OF CHANCERY COURTHOUSE
34 THE CIRCLE
GEORGETOWN, DE 19947

Date Submitted: November 10, 2025
Date Decided: November 21, 2025

Seth A. Niederman, Esquire
Fox Rothschild LLP
1201 N. Market St., Suite 1200
Wilmington, DE 19801

Kurt M. Heyman, Esquire
Emily A. Letcher, Esquire
Heyman Enerio Gattuso & Hirzel LLP
222 Delaware Ave., Suite 900
Wilmington, DE 19801

D. Charles Vavala, III, Esquire
Jordan P. Hicks, Esquire
Wilks Law LLC
4250 Lancaster Pike, Suite 200
Wilmington, DE 19805

RE: *Investview, Inc., et al. v. UIU Holdings LLC, et al.*,
C.A. No. 2025-0327-BWD

Dear Counsel:

This letter opinion resolves motions to dismiss the plaintiffs' complaint for lack of equitable subject matter jurisdiction. For reasons explained herein, the motions are granted, and this action is dismissed with leave to transfer pursuant to 10 *Del. C.* § 1902.

I.    **BACKGROUND**[1]

   A.    **Plaintiffs' Customers Enroll In Defendants' TPP Plan.**

Plaintiff Investview, Inc. ("Investview") is a financial technology company and brokerage trading platform that offers financial education, blockchain technology, and crypto mining.  Compl. ¶¶ 9, 21.  Plaintiff iGenius, LLC ("iGenius," and with Investview, "Plaintiffs"), a wholly owned subsidiary of Investview, provides educational resources related to personal finance and financial markets.  *Id.* ¶ 10.

In 2019, Investview, through another wholly owned subsidiary, Apex Tek LLC, launched a sale-and-leaseback program known as the "Apex Program."  *Id.* ¶ 22.  Customers participating in the Apex Program purchased Bitcoin mining server hardware (the "Equipment") from Investview, then leased the Equipment back to Investview in exchange for fixed monthly lease payments.  *Id.*

Plaintiffs initially presented Apex Program customers with an option to purchase an additional "protection plan" from nonparty Timeless Protect, Inc. for a

---

[1] The following facts are taken from Plaintiffs' Verified Complaint (the "Complaint") and the documents incorporated by reference therein.  Verified Compl. [hereinafter Compl.], Dkt. 1.  The transcript of the November 10, 2025 oral argument on the motions to dismiss has not been finalized.  Citations in the form of "Draft Tr. __" refer to a draft transcript of the November 10, 2025 oral argument. *See* Draft Tr. of 11-10-25 Oral Arg. on Defs.' Mots. to Dismiss [hereinafter Draft Tr.].

fee (the "TPI Plan"). *Id.* ¶ 23. Customers enrolled in the TPI Plan purchased an option to receive cash representing 33% of the Equipment purchase price at the end of year five, 66% of the Equipment purchase price at the end of year nine, or 100% of the Equipment purchase price at the end of year twelve. *Id.*

Defendant UIU Holdings LLC ("UIU") is a Delaware limited liability company and "global insurance brokerage firm" allegedly controlled by Jason R. Anderson, Jacob S. Anderson, and Schad E. Brannon (together with UIU and TPP LLC,[2] "Defendants"). *Id.* ¶¶ 12–17. In October 2019, Defendants approached Plaintiffs with a competing protection plan program (the "TPP Plan"). *Id.* ¶ 24. Under the TPP Plan, for a fee, enrolled customers purchased an option to receive cash representing 50% of the Equipment purchase price at the end of year five or 100% of the Equipment purchase price at the end of year ten.[3] *Id.* ¶ 29. Defendants represented to Plaintiffs that the TPP Plan was backed by insurance. *Id.* ¶¶ 37–52.

Under either a written or "implied-in-fact" contract with Defendants, Plaintiffs began offering Apex Program customers the option to purchase a TPP

---

[2] The Complaint alleges that defendant Total Protection Plus LLC ("TPP LLC") is either affiliated with, or is a trade name of, UIU. *See* Compl. ¶ 13.

[3] For example, if an Apex Program customer enrolled in the TPP Plan purchased Equipment for $13,750, she could elect to receive a cash payment of $6,875 at the end of year five or $13,750 at the end of year ten. *Id.* ¶ 30.

Plan. *Id.* ¶¶ 26–27. Customers who enrolled in the TPP Plan signed a separate agreement with UIU. *Id.* ¶ 33. Plaintiffs collected a TPP Plan fee from the customer and sent it to UIU. *Id.* ¶ 28. UIU then enrolled the customer in the TPP Plan and provided the customer with an identification card and access to information about the policy. *Id.*

In March 2020, Defendants established a client portal for customers enrolled in the TPP Plan to track their coverage, download policy cards, and request claim forms. *Id.* ¶ 43. From May through October, Defendants repeatedly represented to Plaintiffs that UIU had secured insurance for the TPP Plan. *Id.* ¶¶ 44–51. Between November 2019 and March 2021, Plaintiffs paid over $3.3 million to UIU on behalf of Apex Program customers enrolled in the TPP Plan. *Id.* ¶¶ 35–36.

### B. iGenius And TPP LLC Execute A Vendor Program Agreement To Enroll Additional Customers In The TPP Plan.

In January 2021, iGenius contracted with nonparty blockchain provider Oneiro to sell Oneiro's adaptive digital currency "ndau" through iGenius's distribution network. *Id.* ¶ 53.

Plaintiffs agreed to provide Defendants' TPP Plan to customers purchasing ndau. *Id.* ¶¶ 54–56. On January 18, iGenius and TPP LLC entered into a Vendor Program Agreement (the "VPA"), which stated: "Subject to the terms and conditions of this Agreement, [iGenius] hereby agrees to purchase from TPP [LLC] and TPP

[LLC] hereby agrees to sell and deliver to [iGenius] and its clients a guaranteed buyback option, fully backed by an investment grade insurance Policy . . . .” *Id.* ¶¶ 55–56; *see* Aff. of Jacob Anderson in Supp. of the UIU Defs.’ Mot. to Dismiss, Ex. 1 § 1, Dkt. 16.

Between March and December 2021, Plaintiffs paid over $3.6 million to UIU on behalf of ndau customers enrolled in the TPP Plan. Compl. ¶¶ 62–63. Throughout this time, Defendants represented to Plaintiffs and ndau customers that the TPP Plan was fully backed by insurance. *Id.* ¶ 65(f)–(h).

### C. Defendants Fail To Pay Claims Under The TPP Plan.

Defendants directed customers enrolled in the TPP Plan to make a claim during their respective claim windows through an online client portal. *Id.* ¶ 66(c). UIU, as the claims administrator, would make a claim against a bond issued by the insurer, and the insurer would then pay the claims to UIU, which would in turn issue funds to the customer. *Id.* ¶ 66.

As claim windows began to open, however, enrolled customers experienced problems submitting claims. *Id.* ¶ 68. Some customers submitted claims but no longer know the status of those claims, while others could not submit claims because the client portal website was taken down. *Id.* In addition, in November 2022, Defendants purported to impose new conditions for claims, including a requirement

that customers possess the Equipment that was leased back to Plaintiffs under the Apex Program, making it impossible for customers to submit claims. *Id.* ¶ 77. Defendants have not paid any claims under the TPP Plan, and customers cannot submit claims or check the status of their claims. *Id.* ¶¶ 81–83.

### D. Procedural History

On March 28, 2025, Plaintiffs initiated this action through the filing of the Complaint. The Complaint asserts four counts. The First Cause of Action seeks a declaratory judgment that "Defendants have an obligation to fulfill their contractual obligations to Plaintiffs, pay customers' claims in accordance with the terms and conditions of the TPP program, and that Plaintiffs are not liable to customers who have been unable to make claims or check on the status of their claims due to Defendants' failure to uphold their obligations." Compl. ¶ 98. The Second Cause of Action alleges a claim against all Defendants for breach of contract. *Id.* ¶¶ 103–08. The Third Cause of Action alleges a claim against all Defendants for fraudulent inducement, and the Fourth Cause of Action alleges a claim for unjust enrichment. *Id.* ¶¶ 109–18.

Defendants moved to dismiss the Complaint. Dkts. 5, 10.[4] The Court heard oral argument on November 10.

## II. ANALYSIS

Defendants have moved to dismiss the Complaint under Court of Chancery Rules 12(b)(1) for lack of subject matter jurisdiction and 12(b)(6) for failure to state a claim upon which relief may be granted. Jacob S. Anderson and Brannon have also moved to dismiss for lack of personal jurisdiction under Rule 12(b)(2).

"The Court of Chancery will grant a Rule 12(b)(1) motion to dismiss 'if it appears from the record that the Court does not have jurisdiction over the claim.'" *Yu v. GSM Nation, LLC*, 2017 WL 2889515, at *2 (Del. Ch. July 7, 2017) (quoting *Medek v. Medek*, 2008 WL 4261017, at *3 (Del. Ch. Sep. 10, 2008)). "The Court of

---

[4] On July 11, Defendants filed opening briefs in support of their motions to dismiss. UIU Defs.' Opening Br. in Supp. of Their Mot. to Dismiss, Dkt. 15; Def. Schad E. Brannon's Opening Br. in Supp. of His Mot. to Dismiss, Dkt. 17. On August 15, Plaintiffs filed their brief in opposition to the motions to dismiss. Pls. Investview, Inc.'s and iGenius, LLC's Br. in Opp'n to Defs.' Mots. to Dismiss [hereinafter Pls.' Opp'n], Dkt. 21. On September 5, Defendants filed reply briefs. UIU Defs.' Reply Br. in Supp. of Their Mot. to Dismiss, Dkt. 25; Def. Schad E. Brannon's Reply Br. in Supp. of His Mot. to Dismiss, Dkt. 24.

On September 15, defendants Jacob S. Anderson and Schad E. Brannon moved for a protective order and to stay discovery (the "Motion to Stay Discovery"). Def. Jacob S. Anderson's Mot. for Protective Order and to Stay Disc., Dkt. 27; Def. Schad E. Brannon's Joinder in Def. Jacob S. Anderson's Mot. for Protective Order and to Stay Disc., Dkt. 29. On October 10, Plaintiffs opposed the Motion to Stay Discovery. Pls.' Opp'n to Jacob Anderson's Mot. for Protective Order and to Stay Disc., Dkt. 30. The Court took the Motion to Stay Discovery under advisement at the November 10 oral argument. Dkt. 37. In light of the decision herein, the Motion to Stay Discovery is moot.

Chancery is a court of limited jurisdiction." *Id.* Title 10, Section 342 of the Delaware Code states that "[t]he Court of Chancery shall not have jurisdiction to determine any matter wherein sufficient remedy may be had by common law, or statute, before any other court or jurisdiction of this State." 10 *Del. C.* § 342. This Court "maintains subject matter jurisdiction 'only when (1) the complaint states a claim for relief that is equitable in character, (2) the complaint requests an equitable remedy when there is no adequate remedy at law or (3) Chancery is vested with jurisdiction by statute.'" *Smith v. Scott*, 2021 WL 1592463, at \*14 (Del. Ch. Apr. 23, 2021) (quoting *Perlman v. Vox Media, Inc.*, 2019 WL 2647520, at \*4 (Del. Ch. June 27, 2019), *aff'd*, 249 A.3d 375 (Del. 2021) (TABLE)).

The Complaint does not allege an equitable claim,[5] and the Court lacks statutory jurisdiction over Plaintiffs' claims. Plaintiffs' sole jurisdictional hook is a request for "specific performance," which is an equitable remedy. "Although specific performance is an equitable remedy upon which equity jurisdiction might be predicated, that is true only if the complaint, objectively viewed, discloses a

---

[5] The First Cause of Action, which seeks a declaratory judgment, does not provide an independent basis for subject matter jurisdiction. *See Heathergreen Commons Condo. Ass'n v. Paul*, 503 A.2d 636, 642 (Del. Ch. 1985) ("[T]he Court of Chancery has jurisdiction over a declaratory judgment action only if there exists an underlying basis for equity jurisdiction measured by traditional standards . . . .").

genuine need for such equitable relief." *Candlewood Timber Gp., LLC v. Pan Am. Energy, LLC*, 859 A.2d 989, 997 (Del. 2004). "In deciding whether or not equitable jurisdiction exists, the Court must look beyond the remedies nominally being sought, and focus upon the allegations of the complaint in light of what the plaintiff really seeks to gain by bringing his or her claim." *Id.* "Chancery jurisdiction is not conferred by the incantation of magic words[,]" and simply asking for an equitable remedy is not an "open sesame" to equity jurisdiction. *Yu*, 2017 WL 2889515, at *3 (first quoting *McMahon v. New Castle Assocs.*, 532 A.2d 601, 603 (Del. Ch. 1987); then quoting *Int'l Bus. Machs. Corp. v. Comdisco, Inc*., 602 A.2d 74, 78 (Del. Ch. 1991) [hereinafter *IBM Corp.*]). Rather, "[i]f a realistic evaluation [of the pleadings] leads to the conclusion that an adequate remedy is available, this court, in conformity with the command of Section 342 of Title 10 of the Delaware Code, will not accept jurisdiction over the matter." *Id.* at *3 (quoting *McMahon*, 532 A.2d at 603).

Taking a "practical view" of the Complaint in this action, it is apparent that a suit for money damages would provide Plaintiffs with an adequate remedy at law. *See IBM Corp.*, 602 A.2d at 78. The Complaint seeks an order directing "[D]efendants to specifically perform their obligations under the contracts and uphold their financial obligations to all consumers owed money under the protection plans." Compl. at 29. The first part of that request seeks to require Defendants to

"specifically perform their obligations" under the VPA,[6] which obligates TPP LLC to "deliver to [iGenius] and its clients a guaranteed buyback option, fully backed by an investment grade insurance Policy." *Id.* ¶ 56. As alleged in the Complaint, Defendants enrolled Plaintiffs' customers in the TPP Plan but then failed to satisfy their obligations to Plaintiffs and their customers by retaining insurance or processing and paying out claims. *Id.* ¶¶ 66, 83.

To the extent Plaintiffs focus on Defendants' alleged failure to retain insurance, the Delaware Supreme Court's affirmance in *Candlewood* is illustrative. 859 A.2d 989 (Del. 2004). In *Candlewood*, a property owner contracted with the defendant, an oil and gas producer, to permit the defendant to extract oil and gas from its land, conditioned on the defendant purchasing liability insurance. *Id.* at 992. The defendant allegedly failed to purchase insurance, and its drilling caused significant damage to the property. *Id.* The property owner sued in the Court of Chancery, seeking an injunction "to require [the defendant] to purchase an insurance policy covering damage to their property, damage that ha[d] already been inflicted by [the defendant's] actions." *Id.* at 998. The Court concluded that it lacked subject

---

[6] Plaintiffs also appear to seek specific performance of a similar written or "implied-in-fact" contract, *see* Compl. ¶ 27, but if the terms of that supposed contract differ in any material way from the VPA, Plaintiffs have not explained how that is so.

matter jurisdiction over the action, however, because "money damages [we]re sufficient to remedy the alleged breach of contract." *Id.* at 997. "Even if [the defendant] had . . . an insurance policy, it would presumably direct monetary payment to the plaintiffs if damage was done to the property—monetary payment that plaintiffs c[ould] recover as damages without resort to the extraordinary remedy of specific performance." *Id.* at 998. As in *Candlewood*, Defendants' alleged failure to obtain insurance to back the TPP Plan does not provide a basis for injunctive relief when Plaintiffs (and their customers) have an adequate remedy at law in a suit for money damages.

Plaintiffs assert that an order of "specific performance" is nonetheless necessary to compel Defendants to "stand up a claims process" in which Defendants would be required to make payments to customers consistent with the terms of the TPP Plan.[7] In reality, it is not the ability to "make claims," but the payment of funds due under the TPP Plan, that customers seek. The end result and the real purpose of the claims process would be to compel a "monetary payment that [customers] can

---

[7] *See, e.g.*, Draft Tr. at 19:3–6 ("Under both of [the] contracts, [D]efendants were obligated to stand up a claims process . . . ."); *id.* at 23:9–16 ("The relief we are seeking is quintessentially equitable relief in that we are asking for . . . specific performance . . . ."); *id.* at 24:21–24 ("[T]he injunctive relief that we're asking [for] would be in connection to whatever the Court determines necessary to require [D]efendants to stand up that claims process . . . .").

recover as damages," which is available at law. *Candlewood*, 859 A.2d at 998; *see also Mass. Mut. Life Ins. Co. v. Certain Underwriters at Lloyd's of London*, 2010 WL 3724745, at *2 (Del. Ch. Sep. 24, 2010) (finding that where "insurers and bond underwriters have not fulfilled their obligations under their respective policies," "[t]his is fundamentally a breach of contract action for money damages, which is the traditional province of the Superior Court"); *Travelers Indem. Co. v. Reynolds Metals Co.*, 1995 WL 606317, at *2 (Del. Ch. Oct. 2, 1995) (noting that a claim determining coverage is "relief traditionally granted in an action at law").

On this point, the second component of Plaintiffs' prayer for "specific performance" is telling. Compl. at 29. Plaintiffs seek an order directing Defendants to "uphold their financial obligations to all consumers owed money under the protection plans." *Id.* The "injunctive relief" Plaintiffs seek is a monetary payment. *Id.* Plaintiffs fail to explain why an award of damages would not provide an adequate remedy for Defendants' failure to pay out customers' claims.

Plaintiffs contend that an injunction is necessary to prevent "continuing harm" to their business. *See* Pls.' Opp'n at 10, 11 (arguing that an injunction is necessary to avoid a "multiplicity of lawsuits").[8] Yet Plaintiffs have not identified any non-

---

[8] To the extent Plaintiffs suggest that a failure to issue injunctive relief will result in a multiplicity of lawsuits "where a number of other persons similarly situated to the plaintiff

speculative harm to their business.[9]  Customers contracted with Defendants directly to enroll in the TPP Plan, and Plaintiffs do not allege that any customer has initiated legal proceedings or sought other recourse against Plaintiffs.  *See Athene Life & Annuity Co. v. Am. Gen. Life Ins. Co.*, 2019 WL 3451376, at *6 (Del. Ch. July 31, 2019) ("Equitable jurisdiction . . . is only available on this ground where there exists 'a real threat of a multiplicity of lawsuits, and not the *mere possibility* of such suits.'" (emphasis added) (quoting *IBM Corp.*, 602 A.2d at 82)).

More importantly, Plaintiffs have not explained how the injunction they seek would prevent continuing harm.  Defendants allegedly failed to obtain insurance, and there are no allegations of an escrow or account from which the Court could compel the release of funds to pay a damages award.[10]  Thus, it does not appear that

---

will, in the course of events, be required or elect to bring a suit similar to the one plaintiff has brought," that sort of "multiplicity" may be remedied by a class action, which is available at law.  *McMahon*, 532 A.2d at 606–07 ("[T]he Court of Chancery will not take jurisdiction over a matter that satisfies the tests of Rule 23 unless that action is otherwise maintainable in equity.  Thus, ordinarily, equity will not take cognizance of an action unless there is a colorable need for equitable relief or the assertion of a distinctly equitable right.").

[9] Plaintiffs claim that they risk "business disruption and reputational harm, threatened litigation against Plaintiffs, and the incurring of significant legal costs."  Pls.' Opp'n at 10.

[10] *See, e.g.*, *Epic/Freedom, LLC v. Aveanna Healthcare, LLC*, 2021 WL 1049469, at *3 (Del. Ch. Mar. 19, 2021) (holding that the Court lacked subject matter jurisdiction over a claim for a refund where "the tax refund [wa]s held directly by [the defendant], which, if found in breach of the [contract], can be ordered to pay the amount of the tax refund in the form of damages to [the plaintiff]"); *Testa v. Nixon Unif. Serv., Inc.*, 2008 WL 4958861, at *3 (Del. Ch. Nov. 21, 2008) (concluding that the Court lacked subject matter jurisdiction where "there is no specific fund that [the plaintiff] claims is rightfully his, the right he is

an injunction requiring Defendants to process and pay out claims would prevent harm more effectively, or provide relief more efficiently, than an award of money damages.

Accordingly, the Court lacks a basis to exercise subject matter jurisdiction over the dispute.

## III. CONCLUSION

The Complaint is dismissed for lack of subject matter jurisdiction, with leave to transfer to the Superior Court pursuant to 10 *Del. C.* § 1902.

Sincerely,

*/s/ Bonnie W. David*

Bonnie W. David
Vice Chancellor

cc:    All counsel of record (by File & ServeXpress)

---

asserting is fundamentally a legal one, and his legal remedies are entirely sufficient"). To support their argument that specific performance is an appropriate remedy in this case, Plaintiffs cite *East Balt LLC v. East Balt US, LLC*, 2015 WL 3473384 (Del. Ch. May 28, 2015), a decision in which the Court issued a mandatory injunction ordering the release of funds from escrow. As Vice Chancellor Glasscock later explained, *East Balt* "assessed the particular relief sought, [which was] limited . . . to funds held by a third party." *Elavon, Inc. v. Elec. Transaction Sys. Corp.*, 2022 WL 667075, at *3 (Del. Ch. Mar. 7, 2022).